**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**WILLIAM E JOHNSON,**

       **Plaintiff,**

  **v.**                                  **Civil Action 2:18-cv-1240**
                                            **Magistrate Judge Kimberly A. Jolson**

**THE KROGER COMPANY, et al.,**

       **Defendants.**

## OPINION AND ORDER

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c), (Doc. 12), is before the Court on Defendant's Motion to Seal (Doc. 63), Defendants' Motion for Summary Judgment (Doc. 72), Plaintiff's Motion for Partial Summary Judgment – 42 U.S.C. §§ 1981, 1982 and the Ohio Civil Rights Act (Doc. 73), Plaintiff's Motion for Partial Summary Judgment – Spoliation (Doc. 74), and Plaintiff's Motion for Partial Summary Judgment – Malicious Prosecution (Doc. 75). For the reasons that follow, Defendants' Motion for Summary Judgment (Doc. 72) is **GRANTED in part and DENIED in part**; Plaintiff's Motions for Partial Summary Judgment (Docs. 73–75) are **DENIED**; and Defendant's Motion to Seal (Doc. 63) is **GRANTED**.

## I.      BACKGROUND

This case is about alleged racial profiling at Defendant The Kroger Company's ("Kroger") store located at 801 N. Houck Road in Delaware, Ohio (the "Store"). Plaintiff William E. Johnson is a 65-year-old Black man who resides in Delaware, Ohio. (Doc. 47-1, 5:11–15; *id.*, 98:10–16). Defendant Kroger operates a nationwide chain of grocery stores, including the Store. Defendant Michael Simons is a Kroger Senior Asset Protection Specialist. In that role, Defendant Simons' responsibilities include, among others: detecting and apprehending shoplifters, archiving video for

law enforcement requests, training and overseeing asset protection specialists, and handling employee and internal investigations. (Doc. 59-2 at 6–7).

On October 17, 2017, Plaintiff shopped at the Store, as he had done many times before. (Doc. 47-1, 18:14–19:11). Upon entering the Store, he retrieved a shopping cart and placed a circular ad in the upper basket of the cart. (*Id.*, 21:23–24:6). Plaintiff proceeded down the main aisle, looking for DVDs, he says, to send to his granddaughters. (*Id.*, 24:23–26:1). He then placed two DVDs, *Girls Trip* and *Wonder Woman*, in the upper basket of his shopping cart with the circular ad. (*Id.*, 26:20–27:14).

As Plaintiff shopped, Defendant Simons attended a training program at the Store. (Doc. 62, 28:5–15). While walking between departments, Defendant Simons first saw Plaintiff. (*Id.*, 37:4–9). He noticed the DVDs in Plaintiff's cart and told his Kroger coworkers that he was going to surveil Plaintiff. (*Id.*, 42:11–17).

Defendant Simons then approached Plaintiff and asked him if he needed help. (Doc. 47-1, 28:2–10). Plaintiff indicated that he did not need any assistance, and Defendant Simons left the area. (*Id.*, 28:17–23). Suspicious of Plaintiff's placement of the Kroger ad over the DVDs, Defendant Simons went to the Store's video surveillance room so that he could monitor Plaintiff. (Doc. 62, 83:15–23). It took Defendant Simons between one and two minutes to walk to the video surveillance room, during which time Plaintiff was out of Defendant Simons' view. (*Id.*, 92:18–93:4).

Using the cameras in the Store's video surveillance room, Defendant Simons worked to locate Plaintiff. He found him, but not the DVDs because they were no longer in Plaintiff's shopping cart. (*Id.*, 95:19–97:3; *id.*, 113:19–24). What Defendant Simons did see was Plaintiff adjust his sweatshirt, pulling it down and to the left. (*Id.*, 133:22–134:4). Defendant Simons

interpreted this as Plaintiff concealing the DVDs under his clothes. (*Id.*, 113:19–115:1). Plaintiff, in contrast, testified that, before Defendant Simons saw him on the camera, he simply removed the DVDs from his shopping cart and continued shopping for groceries before checking out. (Doc. 47-1, 29:22–32:1).

Exiting the Store, Plaintiff did not set off the anti-theft alarm system, but Defendant Simons confronted him. (*Id.*, 32:15–24; Doc. 62, 117:1–9). The parties disagree about the language Defendant Simons used to address Plaintiff. According to Plaintiff, Defendant Simons called out to him, saying, "Hey, brother," or "Hey, brother man," and "Let me get those DVDs under your hoodie." (*Id.*, 32:25–33:7). Defendant, on the other hand, maintains that, while he addressed Plaintiff as "bro," he did not address him as "brother" or "brother man." (Doc. 62, 205:8–21).

Both parties agree that after Defendant Simons called out and asked Plaintiff about the DVDs, Plaintiff stopped and responded that he did not know what Defendant Simons was talking about. (Doc. 47-1, 34:15–35:17; Doc. 62, 198:15–199:19). Plaintiff then pointed to where he had parked. (Doc. 47-1, 38:5–25). Defendant Simons pursued Plaintiff to his car, threatening to call law enforcement. (*Id.*, 39:1–16). According to Plaintiff, Defendant Simons was aggressive and confrontational in repeatedly accusing him of theft. (Doc. 73-1 at 3).

Again, the parties dispute what happened next. According to Defendant Simons, Plaintiff indicated that he would give Defendant Simons the DVDs at the car, (Doc. 62, 203:13–204:14), and, once they reached his car, Plaintiff removed DVDs from his clothing and placed them in the back seat, (*id.*, 200:11–201:4). Plaintiff denies all of that, and he further asserts that Defendant Simons could not have seen any DVDs in his back seat because of where Defendant Simons was standing. (Doc. 73-1 at 3–4). Because Plaintiff believed he had done nothing wrong, he placed his groceries in the back seat and drove home. (Doc. 47-1, 41:25–43:8).

At home, Plaintiff unloaded the groceries and took a short bike ride with his wife. (*Id.*, 44:3–22). Meanwhile, back at the Store, Defendant Simons reported Plaintiff's alleged theft to the Delaware Police Department. (Doc. 62, 226:19–227:13). Officer Dylan Griffin responded to Defendant's Simon's call, taking Defendant Simons' statement and reviewing the surveillance footage Defendant Simons chose to show him. (Doc. 73-1 at 10–13).

After Plaintiff returned home from the bike ride, Officer Griffin arrived at Plaintiff's house. (Doc. 47-1, 46:4–48:3). He approached Plaintiff and asked him if Plaintiff knew why he was there. (*Id.*, 48:4–9). Plaintiff indicated that he did not. (*Id.*). They then discussed what had occurred at the Store. Officer Griffin asked Plaintiff where the DVDs from the Store were. (*Id.*, 48:13–49:2). Plaintiff denied taking any DVDs from Kroger and offered to show Officer Griffin four old Blu-rays in his car—*Creed*, *Neighbors 2*, *Angry Birds*, and *Minions*. (*Id.*, 49:3–50:19).

A second police officer, Officer William Eusey, then arrived. (*Id.*, 51:9–17). After conferring with Officer Eusey, Officer Griffin placed Plaintiff under arrest and took him to the Delaware Police Station. (*Id.*, 55:8–57:20). Law enforcement detained Plaintiff in a holding cell for roughly two hours. (*Id.*, 66:12–18). While Plaintiff was detained, Officer Griffin prepared a Complaint, Summons, and Trespass Warning. (Doc. 73-1 at 11–12). The Complaint charged Plaintiff with petty theft. (*Id.* at 24). He prepared and served the Trespass Warning on Plaintiff at the request of Defendant Simon for a "[c]riminal [v]iolation" at the Store. (Doc. 72–8, ¶ 15; Doc. 73-1 at 12). Plaintiff asserts—and Defendants do not dispute—that the Trespass Warning bars Plaintiff from shopping at the Store.

Charged with theft, Plaintiff retained a criminal defense attorney. (Doc. 47-1, 67:25–68:22). After counsel provided the prosecutor with evidence that Plaintiff owned the DVDs he

4

was alleged to have stolen, (Doc. 73-1 at 42), the State moved to dismiss the case without prejudice for lack of sufficient evidence, (*id.* at 7).

Since Plaintiff's arrest, he has not shopped at the Store.  (Doc. 45-1, 101:8–102:12).  Instead, he drives "[a]cross town" to shop at a different Kroger.  (Doc. 47-1, 123:21–124:15).

Plaintiff filed his Complaint (Doc. 1) on October 15, 2018.  In his subsequent First Amended Complaint (Doc. 54), Plaintiff alleges that Defendants: (1) violated 42 U.S.C. §§ 1981 and 1982's prohibition on race discrimination in the making and enforcing of contracts, and in the purchasing of personal property; (2) violated the Ohio Civil Rights Act's prohibition on racial discrimination in places of public accommodation; (3) are liable for malicious prosecution; and (4) are liable for spoliation of evidence.  Prior to filing dispositive motions, Defendants moved to seal certain exhibits.  (Doc. 63).  The parties filed cross-motions for summary judgment (Docs. 72–75).  The Motion to Seal and Motions for Summary Judgment are fully briefed and ripe for resolution.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  When the moving party has carried this burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

When a motion for summary judgment is unopposed, as is the case here, the court must

"intelligently and carefully review the legitimacy of such unresponded-to motion" and may not "blithely accept the conclusions argued in the motion." *Guarino v. Brookfield Tp. Tr.*, 980 F.2d 399, 407 (6th Cir. 1992). At the same time, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to identify a genuine issue of material fact. *Id*. at 405.

## III.  DISCUSSION

The parties have filed cross-motions for summary judgment with respect to each of Plaintiff's claims. (*See* Docs. 72–75). The Court addresses each claim in turn.

### A.  42 U.S.C. § 1981

Plaintiff alleges that Defendants violated § 1981 because they intentionally discriminated against him on the basis of race "in the making and enforcing of contracts." (Doc. 54, ¶ 52).

Section 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Absent proof of intentional discrimination, a plaintiff making a claim under § 1981 "must meet the" *McDonell-Douglas* "burden-shifting standard of proof for Title VII cases." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001), *opinion supplemented on denial of reh'g*, 266 F.3d 407 (6th Cir. 2001). If the plaintiff establishes a prima facie case of discrimination, "[t]he burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination." *Id.* (citations omitted).

### 1. *Prima Facie Case*

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. *Id.* (citing 42 U.S.C. § 1981). "The statute's protection extends to 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Christian*, 252 F.3d at 868 (quoting 42 U.S.C. § 1981(b)).

To demonstrate a *prima facie* case of intentional race discrimination in the making and enforcing of contracts, a plaintiff must show that:

(1) plaintiff is a member of a protected class;

(2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and

(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian*, 252 F.3d at 872.

Plaintiff maintains that Defendants violated § 1981's clause concerning making and enforcing contracts in two ways: (1) he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory based on "Defendant Simons' racial profiling of Mr. Johnson, surveiling [sic] him, stopping and confronting him, accusing and intimidating him, causing him to be arrested and prosecuted by making fabricated reports of criminal conduct, and causing the destruction of video evidence"; and (2) he was deprived of the Store's services as a result of Defendant Simons "causing the trespass warning to be issued against him."  (Doc. 80 at 21–22).

> a.  Defendant Simons' allegedly hostile and discriminatory conduct on October 17, 2017

Plaintiff alleges that he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory based on Defendant Simons' conduct on October 17, 2017.

The Sixth Circuit in *Christian* recognized that "a retailer's markedly hostile conduct may give rise to a rational inference of discrimination sufficient to support a prima facie case without any evidence of how similarly situated persons were treated."  252 F.3d at 871 (citation and internal quotations omitted).  Courts consider three factors in evaluating whether a defendant's conduct was markedly hostile, specifically whether the conduct is: "(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination."  *Id.* (citation and internal quotations omitted).  A reasonable jury, based on the facts below, could find that happened here.

Defendant Simons left a training assignment to surveil Plaintiff after noticing DVDs in Plaintiff's shopping cart.  Plaintiff was the only Black male in the Store at that time.  (Doc. 47-1,

98:4–20).  Defendant Simons approached Plaintiff, asked him if he needed assistance, and observed that the DVDs were at least partially covered with a Kroger ad.  (Doc. 62, 62:4–7). During his deposition, Simon admitted that Plaintiff did not react in a guilty or suspicious manner. (*Id.*, 82:7–18).  Defendant Simons, nonetheless, became suspicious because of the placement of the Kroger ad over the DVDs.  (*Id.*, 55:5–9).  But, as Defendant Simons and others testified, customers frequently place ads in their carts while shopping.  (Doc. 49-1, 24:17–20; Doc. 62, 78:2–6).

At some point, Plaintiff removed the DVDs from his cart.  What happened to the DVDs is disputed.  (*See* Doc. 47-1, 30:4–31:13 (Plaintiff testifying that he placed the DVDs back on a shelf); Doc. 62, 113:19–115:1 (Defendant Simons testifying that he saw the DVDs missing from Plaintiff's shopping cart and saw Plaintiff adjust his shirt in a way that suggested he had concealed the DVDs on his person).  But it is agreed that Defendant Simons went to the Store's surveillance room to try and catch Plaintiff shoplifting.  (Doc. 62, 85:19–22).  Defendant Simons could not recall ever surveilling a Caucasian customer in the same way.  (*Id.*, 86:10–20).  And Defendant Simons admits that he never saw Plaintiff conceal the DVDs on his person, (*id.*, 71:19–72:2), and the anti-theft alarm system did not activate when Plaintiff passed through it, (*id.*, 117:1–4).  Yet Defendant Simons still stopped Plaintiff for shoplifting in violation of Defendant Kroger's policy. (*Id.*, 72:3–21).

As he approached Plaintiff, Defendant Simons addressed him as "brother" or "brother man."  (Doc. 47-1, Doc. 32:25–33:4).  Defendant Simons then accused Plaintiff of stealing DVDs, which Plaintiff denied.  (*Id.*, 33:5–35:15).  Plaintiff pointed to his car and exited the store, (*id.*, 38:5–16).  During this exchange and as Plaintiff walked to his car, Defendant Simons "was loud and aggressive both in the way he spoke to [Plaintiff] and in his physical interaction."  (Doc. 73-1

at 3).  "He got very close to [Plaintiff], at times right up in [Plaintiff's] face."  (*Id.*).  Plaintiff was intimidated, uncomfortable, and "somewhat concerned for [his] safety" as a result.  (*Id.*).  Defendant Simons threatened to call the police and followed Plaintiff to his car.  (Doc. 47-1, 39:8–40:6).  After Plaintiff left, Defendant Simons called the police resulting in Plaintiff's arrest and the issuance of the Trespass Warning.  (Doc. 73-1 at 10–13).

On these facts, it is not difficult to conclude that Defendant Simons' "behavior may be characterized as hostile and objectively discriminatory in that it was profoundly contrary to the manifest financial interests of [Defendant Kroger] and far outside of widely-accepted business norms."  *Christian*, 252 F.3d at 879.  As such, a reasonable jury could find that Defendant Simons' conduct described above was markedly hostile under *Christian*.  *See id.* at 878 ("The evidence shows that Christian raised a genuine issue of fact as to whether she received services in a markedly hostile manner and in a manner which a reasonable person would have found objectively discriminatory.  Again, for purposes of this appeal, we must conclude that Monnot reported a shoplifting incident which did not occur, the result of which was that Christian was forced to leave the store and forfeit her right to complete her purchase.").

Indeed, Defendant Simons has acknowledged that he knowingly violated Defendant Kroger's shoplifting policy by stopping Plaintiff because he: (1) did not see Plaintiff remove the DVDs from the display shelf; (2) did not see Plaintiff conceal the DVDs on his person; and (3) did not maintain continued observation of Plaintiff during his time in the Store.  (Doc. 62, 72:3–21; *id.*, 149:20–150:5).  Violating those internal policies and procedures could reasonably be considered evidence that his conduct was "profoundly contrary to the manifest financial interests of the merchant and/or her employees" or "far outside of widely-accepted business norms," *Christian*, 252 F.3d at 871 (citation and internal quotations omitted).  And a jury could reasonably

10

conclude that this violation of Defendant Kroger's policy combined with Defendant Simons' aggressive confrontation of Plaintiff culminating in his wrongful arrest was contrary to Defendant Kroger's financial interests and widely-accepted business norms. *See id.* at 878; *Thompson v. JP Morgan Chase Custody Servs.*, Inc., No. CIV.A. 09-127-JBC, 2011 WL 1226496, at *3 (E.D. Ky. Mar. 29, 2011) ("A jury could reasonably find that a bank does not act in its manifest financial interest or in step with accepted business norms when an employee accuses longtime customers of committing a crime without any basis in fact, and thereby risks losing its business and developing a reputation for that kind of conduct … that discrimination was the underlying reason for Chase Bank's conduct.").

A reasonable jury could also find that the service Plaintiff received was objectively discriminatory. As discussed above, in Plaintiff's version of events, he was the only Black man in the Store that day. Defendant Simons decided to surveil Plaintiff based on routine customer behavior that had never caused him to surveil a Caucasian customer before. Further, when aggressively confronting Plaintiff for a shoplifting incident that did not occur, Defendant Simons used language that Plaintiff considered to be racially tinged and stopped him in violation of Defendant Kroger's shoplifting policy. In combination, this evidence could support an inference of discriminatory behavior. *See Christian*, 252 F.3d at 874–75 (concluding that disparate treatment of Black and Caucasian shoppers gave rise to inference of discriminatory treatment where Black plaintiff was accused of shoplifting); *Leach v. Heyman*, 233 F. Supp. 2d 906, 910–11 (N.D. Ohio 2002) (holding that employee's use of racial epithet and physical confrontation was "indicative of racial animus"). Thus, Plaintiff has presented evidence satisfying his *prima facie* case under § 1981.

Defendants respond that Plaintiff's claim fails as a matter of law because any of the alleged discriminatory conduct occurred after Plaintiff completed his purchase of groceries.  (Doc. 72 at 16–18; Doc. 77 at 23–25; Doc. 81 at 8–12).  For support, Defendants provide a thorough analysis of case law outside the Sixth Circuit.  (*See* Doc. 72 at 16–18; Doc. 77 at 23–25; Doc. 81 at 8–12).  But, as the First Circuit has recognized, the Sixth Circuit "arguably has a more expansive interpretation of § 1981 in 'commercial establishment' cases than" other courts.  *Hammond v. Kmart Corp.*, 733 F.3d 360, 366 (1st Cir. 2013).  And because this Court applies *Christian*'s "expanded formulation," *id.* (citation and quotations omitted), Defendants' argument fails.

*Leach* illustrates how *Christian* applies in the Sixth Circuit.  That case arose "from an altercation between the plaintiff, Michael Leach, who is an African–American, and Jenny Heyman, a former employee at a [Speedway] convenience store." *Leach*, 233 F. Supp. 2d at 908.  The plaintiff and two of his co-workers entered the store where the defendant was at the cash register talking on the phone.  *Id.*  After selecting some items, Plaintiff's African-American co-worker checked out without incident.  *Id.*  The defendant remained on the phone throughout that transaction.  *Id.*

The plaintiff then approached the cash register and asked about the price of a pack of cigarettes.  *Id.*  The defendant remained on the phone and said something like, "how should I know?", but eventually checked and informed him of the price.  *Id.*  He asked the defendant if she had a problem to which she responded that she did not.  *Id.*

> Plaintiff then asked for a different, less expensive brand of cigarettes, which Heyman [the defendant] gave to him. Plaintiff paid for his purchases. Heyman threw his change on the counter. Plaintiff stated that if she got off the phone she might be able to do her job or handle her customers better. Heyman look[ed] at him as if she didn't care what he thought, and threw up her hand in a dismissive way.
>
> As he turned to leave, plaintiff said, under his breath, "Cunt." There is no direct evidence that Heyman heard that epithet. Bohrer, who was standing near both

12

plaintiff and Heyman, testified that, though he heard shouting, he didn't hear any names being uttered by either Heyman or plaintiff. But Heyman apparently believed that plaintiff had said something offensive, because she became agitated, asked plaintiff what he had said, stated she was not a whore, called plaintiff a "Nigger," and said she was going to kick his ass.

Plaintiff stopped by the door, and looked at Heyman. She jumped across the counter, grabbed him, and tried to push him out the door. Plaintiff held up his hands, in one of which he was carrying coffee. Heyman slapped him on the side of his face.

*Id.* at 908–09. The police responded to the scene, and the defendant was charged with assault. *Id.* at 909. The plaintiff subsequently sued her and Speedway for, among other things, violating § 1981.

Applying *Christian*, the Court observed that "[r]acial animus can offend a customer equally whether he gets no service at all or is served in a manner that marks him with the badge of slavery that the Civil Rights Acts were enacted to remove." *Id.* It then rejected the defendants' argument that the plaintiff's claim failed as a matter of law because he "had completed his purchase and was exiting before the discriminatory conduct occurred," emphasizing that the defendants' "treatment of plaintiff was continuous and manifested animus during the entire period that he was in the store." *Id.* at 910. The Court concluded:

I am persuaded that a jury could find that Heyman's conduct throughout the course of her dealing with plaintiff was indicative of racial animus, even though that motivation may have overtly manifested itself only when Heyman came after plaintiff as he was leaving the store. Though she only called plaintiff a name that any African–American would find deeply offensive after he had completed his purchases and was about to exit, that she did so at all is clear and direct proof of bias. It also indicates that the "service" she provided was less than that which she might have provided, had plaintiff been Caucasian.

*Id.* at 911.

*Leach* offers two important lessons. One, the fact that a plaintiff successfully purchases goods or services does not foreclose a § 1981 claim. Two, a defendant's course of conduct before

and after the purchase of goods or services is relevant to the question of whether a plaintiff "received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory," *Christian*, 252 F.3d at 872. The Court is, therefore, not persuaded by Defendants' argument that Plaintiff's claim fails because he was able to purchase his groceries. Nor is the Court persuaded by Defendants' contention that, as a matter of law, Plaintiff did not receive services in a markedly hostile manner, (Doc. 72 at 18–19; Doc. 77 at 25–26; Doc. 81 at 12–14). In their view, the Court is required to focus on the actions of Defendant Simons, "not the subjective feelings of the plaintiff." (Doc. 77 at 26 (citation omitted)). That is an accurate statement of the law. *See Christian*, 252 F.3d at 871 (identifying objective factors to be considered in analyzing the markedly hostile prong); *id.* at 874–75 (analyzing defendant's conduct under an objective standard). But, as discussed above, in Plaintiff's version of events, Defendant Simons singled him out for surveillance for routine customer behavior and aggressively confronted him for a shoplifting incident that never occurred in violation of Defendant Kroger's policy. Relying on these objective, albeit disputed, facts, a reasonable jury could conclude that Plaintiff received services in a markedly hostile manner.

b. Trespass Warning

Plaintiff next argues that there is a second basis for finding Defendants liable under § 1981. According to Plaintiff, the Delaware Police Department issued the Trespass Warning at the direction of Defendant Simons, and it "prohibited him from going to the [Store] under penalty of criminal prosecution. That ban has never been rescinded, and thus remains in full force and effect to this day." (Doc. 73 at 13). In his view, the Trespass Warning "was no different in effect than an armed guard at the door saying 'you can't come in.'" (Doc. 80 at 25). Because Defendant Simons' actions were motivated by racial animus, he contends, Defendants violated § 1981 by

14

denying him the Store's services while similarly situated persons outside the protected class were not.

Again, Defendants disagree.  They argue that Plaintiff cannot satisfy the second element of a *prima facie* case because he has not sought to make or enforce a contract for services normally provided by the Store.  (Doc. 72 at 19–21).  Because Plaintiff has not demonstrated the actual intent to form a contract with the Store after the issuance of the Trespass Warning, they assert, his § 1981 claim based on the same fails.  (*Id.*).

Once more, *Christian* guides the Court here.  To establish a *prima facie* case under § 1981, a plaintiff must demonstrate that he or she "sought to make or enforce a contract for services ordinarily provided by the defendant."  252 F.3d at 872.  That standard is satisfied where, for example, a plaintiff "selected merchandise to purchase, had the means to complete the transaction, and would, in fact, have completed her purchase had she not been asked to leave the store."  *Id.* at 874.  Courts in the Sixth Circuit and elsewhere generally find that speculation regarding an intent to enter a contract is insufficient to satisfy this element.  *See, e.g.*, *Johnson v. Value City Dep't Store*, No. 3:06CV-49-R, 2006 WL 1642307, at *2 (W.D. Ky. June 12, 2006) ("Here, fatal to Plaintiff's complaint, is the absence of any allegation that he entered Value City with the intent to make a purchase or formed the intent to do so after arriving at the store."); *Horne v. J.C. Penney Corp.*, No. 5:05-CV-27, 2006 WL 1139918, at *8 (W.D. Mich. Apr. 26, 2006) (emphasizing that "[o]ther courts that have considered the clause have held that a plaintiff must allege interference with an actual, as opposed to speculative, contract interest" and finding that the plaintiffs' § 1981 claim failed because they did not "point to any evidence in the record indicating that they intended to make a purchase at J.C. Penney").

15

This case presents a different and more difficult question than those confronted by the courts above:  Can a plaintiff bring a § 1981 claim based on a store banning them from the premises, allegedly because of racial animus?  The Fifth Circuit considered one species of this question in *Morris v. Dillard Department Stores, Inc.*  There, the African-American plaintiff was shopping with a friend at the defendant's store when a private security guard began following her based on an employee's report that the plaintiff had shoplifted merchandise.  277 F.3d 743, 746 (5th Cir. 2001).  The security guard followed the plaintiff to her car and wrote down her license plate number before returning to the store.  *Id.*  Upset by the security guard's behavior, the plaintiff returned to the defendant's store and confronted him, resulting in her arrest and detention.  *Id.* at 746–47.  She subsequently filed a lawsuit, alleging, among other things, that the defendants had violated § 1981 based on their treatment of her.  *Id.* at 747.

The plaintiff's § 1981 claim was "based on the uncontroverted fact that Dillard's banned Morris [the plaintiff] from the store for a period subsequent to her arrest."  *Id.* at 751.  The district court "found that Morris failed to show the loss of an actual contract interest," and the Fifth Circuit agreed.  *Id.* at 751–52.  Reviewing decisions outside the Fifth Circuit, the Court noted that "such claims have [been] consistently rejected … as too speculative where a plaintiff makes allegations of the mere possibility that a retail merchant would interfere with a customer's attempt to contract in the future."  *Id.* at 752 (collecting cases).  The Court continued, explaining that, "to raise a material issue of fact as to her § 1981 claim, Morris must offer evidence of some tangible attempt to contract with Dillard's during the course of the ban, which could give rise to a contractual duty between her and the merchant, and which was in some way thwarted."  *Id.*  And because she did not do so, her § 1981 claim failed.  *See id.* at 753 ("Morris points to no evidence in the record indicating that she made any tangible attempt to purchase, or to return, specified goods at the store,

or to enter any other contractual agreement with Dillard's, at any time during the course of the ban. We agree with the district court, therefore, that Morris's allegations based on the ban alone are too speculative to establish loss of any actual contractual interest owed to her by Dillard's.").

*Morris* is distinguishable. On the record there, the Court could only speculate whether the trespass ban prevented the plaintiff from shopping at Dillard's. In contrast here, no such guesswork is required. The record contains significant evidence from which a jury could conclude that, but for the Trespass Warning, Plaintiff would have continued to shop at the Store. From approximately 2001 through October 2017, Plaintiff shopped at the Store on an almost daily basis. (Doc. 73-1, ¶ 2). According to Plaintiff, he "had no intention before October 17, 2017 of changing [his] shopping habits, and [he] certainly would have continued making regular purchases at the [Store] if [he] had not been given the Trespass Warning[.]" (*Id.*, ¶ 10). Since the Delaware Police Department issued Plaintiff the Trespass Warning at the direction of Defendant Simons, Plaintiff has not returned to the Store. (Doc. 45-1, 102:8–103:12). Further, neither party disputes that the Trespass Warning banned Plaintiff from the Store. On these facts, a reasonable jury could infer that, but for the Trespass Warning, Plaintiff would have continued to shop at the Store.

Beyond *Morris* being factually different, a more fundamental question remains. Under *Christian*, should a plaintiff who provides evidence that he or she was banned from a store because of racial discrimination still be required to try and shop at that store to state a claim under § 1981?

In a similar context under Title VII, the answer is no. When an employer explicitly announces or consistently enforces a policy of discrimination, a potential job applicant need not actually apply to state a claim of discrimination. *See Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who

17

ignored the sign and subjected themselves to personal rebuffs … When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").  A non-applicant must "prov[e] that he would have applied for the job had it not been for those practices" in order meet his burden under *McDonell Douglas*.  *Id.* at 367.

That is relevant here because courts regularly consider Title VII when interpreting claims under § 1981.  *See, e.g.*, *Christian*, 252 F.3d at 868 (recognizing that the Sixth Circuit had "held that to prevail in a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the [*McDonnell Douglas*] burden-shifting standard of proof for Title VII cases"); *id.* at 877 (analyzing causal nexus requirement under § 1981 by analogizing it to Title VII wrongful termination case); *Allen v. Ohio Dep't of Rehab. & Correction*, 128 F. Supp. 2d 483, 495 (S.D. Ohio 2001) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999)) ("The elements of a prima facie case under § 1981 are the same for those in a Title VII action.").  And, as the Supreme Court has made clear, § 1981 protects against the impairment of a contractual relationship for "the would-be contractor along with those who already have made contracts," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

In other words, "[s]ection 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Id.*  Consistent with that offer of relief, a plaintiff need not seek to make or enforce a contract for services ordinarily provided by the defendant where the defendant has banned that individual from contracting for its services as a result of racial animus.  *Accord Int'l*

*Broth. of Teamsters*, 431 U.S. at 365–66 ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").

Under this understanding, Plaintiff has done enough to take his trespass warning claim to a jury. *Accord Int'l Broth. of Teamsters*, 431 U.S. at 367 (holding that, under Title VII, a non-applicant can state a *prima facie* case for hiring discrimination under *McDonnell Douglas* if he "proves that he would have applied for the job had it not been for" explicit or consistently enforced discriminatory policies). And, consistent with the analysis above, *see supra* Section III.A.1.a., a reasonable jury could conclude that the Trespass Warning was issued as a result of Defendant Simons' alleged racial animus, depriving Plaintiff of Defendant Kroger's services while similarly situated persons outside the protected class were not.

### c. Full and Equal Benefit Clause

Less compelling is Plaintiff's final argument for establishing a *prima facie* case under § 1981. In his Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiff asserts that his § 1981 claim can proceed based on its provision that "[a]ll persons … shall have the same right … to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," 42 U.S.C. § 1981(a). (Doc. 80 at 27–28).

But this claim is absent from Plaintiff's First Amended Complaint. (*See* Doc. 54, ¶ 52 (asserting that §§ 1981 and 1982 "prohibit intentional race discrimination in the making and enforcing of contracts, and in the purchasing of personal property" and alleging that Plaintiff's rights under § 1981 had been violated under the "make and enforce contracts" clause)). That is a problem. Plaintiff cannot use the summary judgment process to bring claims that were never raised in his Amended Complaint. *Heru v. Ohio*, No. 2:17-CV-658, 2019 WL 4413041, at *2 (S.D. Ohio

Sept. 16, 2019) (citing *Tucker v. Union on Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005); *Hubbard v. Select Portfolio Servicing, Inc.*, No. 16-CV-11455, 2017 WL 3725475, at *3 (E.D. Mich. Aug. 30, 2017), *aff'd*, 736 F. App'x 590 (6th Cir. 2018), *reh'g denied* (June 28, 2018)). Defendants are entitled to summary judgment on this claim as a result.

### 2. *Legitimate, Nondiscriminatory Reason for Defendants' Actions*

Having determined that Plaintiff has established a *prima* facie case under § 1981, the Court now examines whether Defendants have articulated a legitimate, nondiscriminatory reason for their actions.

The Court finds that they have met their burden here. In their defense, they assert that Defendant Simons suspected Plaintiff of shoplifting and deny that his actions were motivated by race. And they have presented evidence demonstrating as much. (Doc. 72 at 21–23 (citing evidence that: DVDs are a high theft item; Plaintiff partially concealed the DVDs in his cart, a common tactic of shoplifters; Defendant Simons observed that the DVDs were no longer in Plaintiff's shopping cart and saw Plaintiff adjust his shirt in a manner that he believed was suspicious; and Defendant Simons denied that race played any role in his decision to stop and report Plaintiff for shoplifting)). So they have met their burden. *See Christian*, 252 F.3d at 879 (holding that defendant's stated basis for its actions, to prevent shoplifting, sufficiently articulated a legitimate, non-discriminatory reason at the second phase of the burden-shifting framework).

### 3. *Pretext*

Now it is Plaintiff's turn again. He must present evidence from which a jury could find that Defendants' legitimate, nondiscriminatory reason for their conduct was a pretext for racial discrimination. Plaintiff argues not only has he established a genuine issue of material fact as to the issue of pretext, but also that the evidence of pretext is so overwhelming that no reasonable

jury could believe Defendants' account of events, and he is entitled to summary judgment as a result. Not so, Defendants argue. According to them, there is no evidence that Plaintiff was treated differently due to his race; at worst, Defendant Simons made a good faith mistake when he stopped Plaintiff for shoplifting.

Once a defendant produces evidence of a legitimate, non-discriminatory reason for its action, a plaintiff must demonstrate that reason was not the "true reason, but was a pretext for discrimination." *Christian*, 252 F.3d at 879 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The plaintiff may attempt to prove that she was the victim of intentional discrimination 'by showing that 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; and 3) that the stated reasons were insufficient to explain the defendant's action.'" *Christian*, 252 F.3d at 879 (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)). "In reaching the ultimate conclusion that the defendant intentionally discriminated, 'it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" *Christian*, 252 F.3d at 879 (quoting *Reeves*, 530 U.S. at 147). As the Supreme Court has explained, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). "This is so because 'once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Christian*, 252 F.3d at 879 (quoting *Reeves*, 530 U.S. at 147).

*Christian* provides a straightforward answer to the question of pretext here. In Plaintiff's version of events, he did not shoplift, and Defendant Simons' account is not true. "If [Plaintiff]

did not shoplift, then [he] easily raise[s] a jury issue as to whether [Defendant Simons] fabricated the incident and then" called the police, resulting in Plaintiff's wrongful arrest. *Christian*, 252 F.3d at 879. "In other words, a reasonable jury could … believe[] that [Defendants'] stated reason for interfering with [Plaintiff's] right to contract had no basis in fact." *Id.* And, as a result, a reasonable jury "could infer the ultimate fact of discrimination from the falsity of [Defendant Simons'] explanation combined with the evidence supporting [Plaintiff's] prima facie case." *Id.* at 880.

Plaintiff, ambitiously, goes one step further. He asserts that he is entitled to summary judgment because Defendant Simons' account is so blatantly contradicted by the record that no reasonable jury could believe it. (Doc. 73 at 5–7; *id.* at 48–71; Doc. 82 at 3–32).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). That rule does not apply here.

In Defendants' account, Defendant Simons was trained to keep an eye on high-theft items like DVDs when concealed in a shopping cart. (Doc. 72-3, ¶¶ 5–7; Doc. 72-4, ¶¶ 4–6; Doc. 72-5, ¶¶ 5–7; Doc. 72-6, ¶¶ 5–7). He started surveilling Plaintiff when he noticed that the DVDs in Plaintiff's shopping cart were partially concealed by a Kroger ad. (Doc. 62, 42:11–17). Once he started surveilling Plaintiff on video, he saw that the DVDs were no longer in Plaintiff's shopping cart. (*Id.*, 95:19–97:3; *id.*, 113:19–24). Defendant Simons then saw Plaintiff adjust his shirt around his waistband, causing Defendant Simons to suspect that Plaintiff had concealed the DVDs on his person. (*Id.*, 113:19–115:1). Further, in Defendant Simons' experience, the Store's anti-theft security alarm did not always alert when a customer passed through with stolen merchandise.

22

(Doc. 72-5, ¶ 10).  When Defendant Simons confronted Plaintiff about the DVDs, Plaintiff told him that he would give them to him once they got to Plaintiff's car.  (Doc. 62, 203:13–204:14).  Although Plaintiff denied stealing the DVDs, he made no effort to show Defendant Simons that he did not have any DVDs concealed on his person.  (Doc. 47-1, 35:18–24).  Then, at Plaintiff's car, Defendant Simons saw Plaintiff remove the DVDs from his person and put them in the backseat of his car before driving off.  (Doc. 62, 200:11–201:4).

Defendant Simons then called the Delaware Police Department and gave a statement to Officer Griffin.  (Doc. 62, 226:19–227:13; Doc. 73-1 at 10–13).  He reviewed video footage with Officer Griffin who noted that Plaintiff adjusted his shirt in a way that could have suggested he was concealing Kroger merchandise under his clothes.  (Doc. 72–8, ¶¶ 8–9).  When Officer Griffin questioned Plaintiff at his house about the DVDs, Plaintiff's initial response was to offer them to Officer Griffin to be returned to Kroger.  (*Id.*, ¶ 12).

On these facts, a reasonable jury could conclude that: (1) Plaintiff did not shoplift, and Defendant Simons' actions were an honest mistake, or (2) Plaintiff did shoplift, and Defendant Simons' actions were justified.  In other words, a reasonable jury could conclude that Defendant Simons' conduct was based on a legitimate, non-discriminatory reason, rather than animated by race.

To be sure, Plaintiff has offered a thorough factual account of his own that undermines and contradicts much of Defendant Simons' account.  (Doc. 73 at 16–71).  Plaintiff's evidence, however, is not so overwhelming that a reasonable jury could believe only his version.  A jury, not the Court, must consider and resolve these competing accounts and make a credibility determination accordingly.

23

**B.     42 U.S.C. § 1982**

Turning to Plaintiff's next claim, he argues that Defendants' involvement in the issuance of the Trespass Warning and the resulting ban on him shopping at the Store violated § 1982.

Section 1982 provides that all citizens "shall have the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.  "Applied in the context of a purchase of personal property," courts have considered the following elements: "1) plaintiff is a member of a racial minority; 2) he sought to purchase personal property; 3) he was unable to purchase the property; and 4) the property remained available for sale to others."  *Leach*, 233 F. Supp. 2d at 911.  Importantly, the elements of a *prima facie* § 1982 case are the same under § 1981.  *Selden Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 785 F.2d 152, 159 (6th Cir. 1986); *see also Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768, 203 L. Ed. 2d 53 (2019) (quoting 42 U.S.C. §§ 1981(a), 1982) ("In the Civil Rights Act of 1866, … Congress established a rule of equal treatment for newly freed slaves by giving them the 'same right' to make and enforce contracts and to buy and sell property 'as is enjoyed by white citizens.'"); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 447 (2008) ("[O]ur precedents have long construed §§ 1981 and 1982 similarly.").

Just as a jury could find that the Trespass Warning issued at Defendant Simons' direction prevented Plaintiff from making and enforcing contracts with Defendant Kroger at the Store, a jury could find that it prevented Plaintiff from buying personal property from the Store as well. *See Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) (analyzing § 1981 and § 1982 claims together); *cf. Morris v. Office Max, Inc.*, 89 F.3d 411, 415 (7th Cir. 1996) (holding that the plaintiff's § 1982 personal property claim failed for the same reason the plaintiff's § 1981 claim

failed).  As a result, the Court finds that Plaintiff's § 1982 claim based on the Trespass Warning

survives summary judgment for the same reason his § 1981 claim survived.

### C.     Ohio Civil Rights Act

Next, Plaintiff argues that his Ohio Civil Rights Act claim survives summary judgment

based on the survival of his § 1981 and § 1982 claims.  The Court agrees.

The Ohio Civil Rights Act provides, in relevant part:

> It shall be an unlawful discriminatory practice … [f]or any proprietor or any
> employee, keeper, or manager of a place of public accommodation to deny to any
> person, except for reasons applicable alike to all persons regardless of race … , the
> full enjoyment of the accommodations, advantages, facilities, or privileges of the
> place of public accommodation.

Ohio Rev. Code § 4112.02(G).  "Full enjoyment means the right to be admitted to any place of

public accommodation, and the right to have access to the services and products of such a place in

the same manner as all other customers."  *Romanowich v. Ashford Columbus Easton LP*, No. 2:19-

CV-1110, 2019 WL 3017115, at *2 (S.D. Ohio July 10, 2019) (citation and quotations omitted).

"The purpose of the statute is to eradicate illegal discrimination in places of public accommodation

so that full enjoyment is available to all. The thrust of the statute, by its terms, is the comparability

of treatment. Any denial of enjoyment of services must be applicable to all persons."  *Id.* (citation

and quotations omitted).

Plaintiff's Ohio Civil Rights Act claim "rises and falls with his federal claim[s]."

*Christian*, 252 F.3d at 880 (citing *Jackson v. City of Columbus*, 194 F.3d 737, 756 (6th Cir. 1999)).

Because Plaintiff's § 1981 and § 1982 claims survive summary judgment, so too does his Ohio

Civil Rights Act claim.

### D.     Malicious Prosecution

Plaintiff also contends that Defendants are liable for malicious prosecution based on

Defendant Simons' actions resulting in Plaintiff's allegedly wrongful arrest.  (Doc. 54, ¶ 55).  But

Defendants argue that Plaintiff has not presented evidence demonstrating the first two elements of

a malicious prosecution claim. (Doc. 72 at 25–30).

"To sustain an action for malicious prosecution under Ohio law," a plaintiff "must establish: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in his favor." *Wright v. City of Euclid, Ohio*, No. 19-3452, — F.3d —, 2020 WL 3278698, at \*16 (6th Cir. June 18, 2020). "Ohio law defines 'malice' as 'an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice.'" *Harris v. Bornhorst*, 513 F.3d 503, 521 (6th Cir. 2008) (quoting *Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990)). "[T]he absence of probable cause to seize a person raises an inference of malice." *Wright*, 2020 WL 3278698, at \*16 (collecting cases).

A reasonable jury could find Defendant Simons responsible for instituting Plaintiff's prosecution. As a general rule, a private person that provides information to law enforcement cannot be responsible for malicious prosecution where a public official exercises his or her "uncontrolled discretion" to "initiate[] criminal proceedings based upon that information." *Archer v. Cachat*, 135 N.E.2d 404, 406 (Ohio 1956). But, if that private person provides information that is false, "an intelligent exercise of the officer's discretion becomes impossible and a prosecution based thereon is procured by the person giving the false information." *Id.* Under those circumstances, that private person is considered responsible for instituting the prosecution. *Id.*

In Plaintiff's version of events, that is what occurred here. He has presented evidence that he did not steal any DVDs, and Defendant Simons knowingly lied about him doing so to law enforcement, causing him to be wrongfully arrested and prosecuted. A reasonable jury could find Defendant Simons liable for instituting Plaintiff's criminal prosecution as a result. *See id.*

Is there evidence in the record from which a jury could conclude that Defendant Simons *maliciously* instituted Plaintiff's criminal prosecution? Yes, as the Court's prior analysis of Plaintiff's civil rights claims demonstrates, *see supra* Section III.A.3., a reasonable jury could conclude that Defendant Simons' actions were motivated by racial animus, rather than the belief that Plaintiff had committed a crime, which would support a finding of malice, *see Harris*, 513

26

F.3d at 521.  And to the extent a jury could find that Defendant Simons lied in ways that were material to the decision to prosecute Plaintiff, this too would support a finding of malice.  *See Jones v. City of Elyria, Ohio*, 947 F.3d 905, 921 (6th Cir. 2020) ("Here, viewing the facts in the light most favorable to Jones, a reasonable jury could infer malice on behalf of all three officers. As discussed above, the jury could find that all three officers lied in ways that were material to the eventual decision to prosecute Jones, for the purpose of justifying their own prior actions.").

An analysis of the probable cause element further supports an inference of malice here.  *Cf. Wright*, 2020 WL 3278698, at *16 (collecting cases) ("[T]he absence of probable cause to seize a person raises an inference of malice.").  "[P]robable cause is assessed based on the facts and circumstances known at the time the offense is charged," and it requires "[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged."  *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003) (citation and quotations omitted).

Plaintiff was charged with petty theft in violation of Ohio Revised Code § 2913.02(A)(1). It provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services … [w]ithout the consent of the owner or person authorized to give consent."  Ohio Rev. Code § 2913.02(A)(1).  The Court construes the facts in a light most favorable to Plaintiff.  The events leading to Defendant Simons' report to law enforcement began when he noticed DVDs in Plaintiff's shopping cart.  (Doc. 62, 37:4–9; *id.*, 42:11–17).  Defendant Simons approached Plaintiff, and Plaintiff did not respond or act in a suspicious manner.  (Doc. 47-1, 28:2–10; Doc. 62, 82:7–18).  Defendant Simons, nonetheless, traveled to the Store's video surveillance room to track Plaintiff.  (Doc. 62, 83:15–23).  When he located Plaintiff, he noticed that the DVDs were no longer in Plaintiff's shopping cart.  (*Id.*, 95:19–97:3; *id.*, 113:19–24).  Customers regularly pick up merchandise, decide not to purchase it, and return it from their shopping cart to the Store's shelves.  (Doc. 59 at 48:8–49:9).

Defendant Simons never saw Plaintiff conceal the DVDs on his person, and, after seeing Plaintiff with the DVDs in his cart, Defendant Simons did not maintain constant visual contact with Plaintiff. (Doc. 62, 72:3–21; *id.*, 149:20–150:5). He did, however, notice Plaintiff adjust his shirt. When Plaintiff exited the Store, the accurate, well-maintained anti-theft alarm system did not alert. (Doc. 62, 117:1–4). Then, at Plaintiff's car, Defendant Simons could not have seen DVDs in the back seat because of where he stood. (Doc. 73-1 at 3–4).

In short, when construing the facts in a light most favorable to Plaintiff, the only undisputed inculpatory evidence known at the time Plaintiff was charged was: Defendant Simons saw DVDs in Plaintiff's shopping cart; he subsequently noted that DVDs were no longer in Plaintiff's shopping cart; and Defendant Simons noticed Plaintiff adjust his shirt near his waistband before he checked out. These facts by themselves are a tenuous basis for a finding of probable cause. But a reasonable jury could conclude that Defendant Simons lacked probable cause based on the significant exculpatory evidence described above. Because the issue of probable cause turns on whose version of events one believes, the jury, and not the Court, must resolve this issue.

*Copas v. Emro Marketing, Inc.*, on which Defendants rely, does not change that conclusion. No. 17275, 1999 WL 114975 (Ohio Ct. App. Mar. 5, 1999). Most importantly, Defendants ignore the material differences between that case and this one. In *Copas*, a store employee performed an inventory that showed missing items immediately after the plaintiff's visit to the store. *Id.* at *6. And "surveillance videotape showed Copas selecting cassette tapes from the display rack and never putting them back." *Id.* That video evidence and the missing inventory supported the store's theft allegations. *Id.* Here, everyone agrees nothing like that happened. So *Copas* is inapposite, and Defendants' malicious prosecution argument fails as a result.

On the other side of the coin, Plaintiff's malicious prosecution argument is just as unpersuasive as Defendants'. Similar to his civil rights claims, he contends that the evidence in the record is so overwhelming that only his version of events can be believed and that he is entitled

28

to summary judgment as a result.  Just as the Court rejected that argument earlier, *see supra* Section III.A.3., it rejects it here for the same reason.

### E.  Spoliation of Evidence

Plaintiff alleges that Defendants interfered with and destroyed evidence that would have demonstrated he did not steal DVDs from the Store.  (Doc. 54, ¶¶ 57–59).  Again, Defendants seek summary judgment.

Under Ohio law, a claim for spoliation of evidence requires a plaintiff to show: "(1) pending or probable litigation, (2) the defendant's knowledge of such litigation, (3) the defendant's willful destruction of relevant evidence, (4) actual disruption of a claimant's litigation due to the destruction, and (5) damages flowing from the spoliation."  *Newberry v. Silverman*, 789 F.3d 636, 647 (6th Cir. 2015) (quoting *Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993)).  The Court addresses each element in turn.

#### 1.  *Pending or Probable Litigation*

Plaintiff has presented evidence that litigation was pending at the time of the alleged willful destruction of relevant evidence.  As a result of Defendant Simons' report, Plaintiff was charged with petty theft on October 17, 2017.  (Doc. 62-2 at 20).  Approximately 30–40 days after that, the Store's video footage from that day was deleted.  (Doc. 62, 154:10–14).  The criminal case against Plaintiff was still pending at that time.  (*See* Doc. 73-1 at 7 (Delaware Municipal Court Judgment Entry dismissing the case on March 30, 2018)).  Moreover, as discussed below, a jury could find that civil litigation was probable.

#### 2.  *Defendants' Knowledge*

Defendant Simons contacted law enforcement to report Plaintiff for allegedly stealing the DVDs and assisted Officer Griffin with his investigation of the alleged theft, resulting in Plaintiff's

arrest. (*See generally* Doc. 73-1 at 10–13). A reasonable jury could find that he had knowledge that a criminal case against Plaintiff was pending or probable as a result.

Further, Plaintiff has presented evidence from which a jury could conclude that Defendant Simons had knowledge that civil litigation was probable where an asset protection specialist's actions resulted in the wrongful prosecution of a customer for shoplifting. Defendant Kroger's Shoplifting Policy is designed to prevent employees from mistakenly accusing or prosecuting customers for shoplifting, in part, to limit Defendant Kroger's liability in civil litigation. (Doc. 59, 114:12–19; *id.*, 131:7–21). As part of his training, Defendant Simons was taught that, if he wrongly accused someone of theft, civil litigation against Defendant Kroger and himself was probable. (Doc. 62, 265:19–24). In Plaintiff's version of events, that is what happened here. And the Court is obligated to assume that version, which is supported by at least some evidence, is true when considering Defendants' Motion for Summary Judgment.

### 3. *Willful Destruction of Relevant Evidence*

"In a spoliation case, the term 'willful' reflects an intentional and wrongful commission of the act." *Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 779 (S.D. Ohio 2017), *aff'd in part, appeal dismissed in part sub nom. Stillwagon v. City of Delaware, Ohio*, 747 F. App'x 361 (6th Cir. 2018) (citation and quotations omitted). "Acts that are willful include those committed with premeditation, malice, or a bad purpose." *Maynard v. Jackson Cty. Ohio*, 706 F. Supp. 2d 817, 829 (S.D. Ohio 2010) (citations omitted). The issue of willfulness is generally a question for a jury. *See, e.g.*, *Kish v. City of Akron*, 200 F. App'x 390, 394–95 (6th Cir. 2006) (concluding that issue of willfulness was a jury question); *Sheets v. Norfolk S. Corp.*, 671 N.E.2d 1364, 1370–71 (Ohio Ct. App. 1996) (same).

Plaintiff has presented evidence demonstrating willfulness. Defendant Kroger's Shoplifting Policy requires employees to retain video evidence if "CCTV was used to identify, observe, or monitor the suspected shoplifter, partially or in total." (Doc. 59-3 at 21). Relevant here, it requires loss prevention employees to collect *all* of the video evidence of a suspected shoplifter and archive it. (Doc 59, 54:23–56:5; Doc. 68-1, 30:21–31:8). Defendants failed to comply with that policy. (*See* Doc. 62, 154:10–14 (acknowledging that Defendants allowed the video footage to be deleted after 30 or 40 days without preserving it)). And, as discussed above, a reasonable jury that believed Plaintiff's version of events could find that Defendant Simon was motivated by racial animus, rather than a good faith belief that Plaintiff shoplifted, when he knowingly lied to the police about the same, resulting in Plaintiff's allegedly wrongful arrest. Relying on these facts, a reasonable jury could infer that Defendants acted willfully.

Further, Plaintiff has presented evidence demonstrating that Defendants willfully destroyed *relevant* evidence. The Store has an extensive network of surveillance cameras that record continuously. (Doc. 59, 71:10–14; Doc. 62, 98:16–23). The network is designed in a way to permit maximum surveillance of the public areas of the store. (Doc. 61, 162:1–14). Multiple cameras recorded Plaintiff during his time in the Store, including the time period after Defendant Simons noticed Plaintiff with DVDs in his shopping cart and before Defendant Simons located Plaintiff on the cameras in the video surveillance room. (Doc. 62, 280:8–15). That video evidence would have been relevant because it covered the key time period in which Plaintiff either concealed the DVDs on his person to steal them or simply placed them back on the shelf after deciding they were inappropriate for his grandchildren.

At base, a jury must resolve the question of whether Defendants willfully destroyed the relevant video evidence or negligently allowed them to be deleted.

31

Defendants, nonetheless, maintain that they are entitled to summary judgment. First, they argue that there is no evidence that they acted maliciously because the relevant video footage was deleted pursuant to their standard retention policy. (Doc. 72 at 30–32). But, as discussed above, Plaintiff has presented evidence that Defendants actually violated Defendant Kroger's Shoplifting Policy by failing to retain that footage. So Defendants' argument is unpersuasive. *Cf. Nye v. CSX Transportation, Inc.*, 437 F.3d 556, 569 (6th Cir. 2006) (affirming grant of defendant's summary judgment motion, in part, because even if the allegedly spoliated evidence ever existed, it was destroyed pursuant to internal company policy and normal business practice).

In this case, if Defendants had presented unrebutted evidence that the relevant video evidence was destroyed pursuant to Defendant Kroger's retention policy, they would be entitled to summary judgment on this claim. *See id.* But Plaintiff has presented evidence of the opposite. There is evidence that Defendants actually violated their retention policy when they failed to retain the relevant video footage. (*See* Doc. 59-3 at 21; Doc 59, 54:23–56:5; Doc. 68-1, 30:21–31:8).

Second, according to Defendants, Plaintiff's spoliation claims fails because its "basis ... is that Simons did not save additional video Johnson speculates would otherwise exist." (Doc. 81 at 34; *see also* Doc. 78 at 5 (citation omitted) ("[T]o sustain a spoliation of evidence claim, the plaintiff must offer proof that the defendant destroyed evidence that actually existed")). "A spoliation claim cannot be based upon conjecture that evidence might have existed and that a party might have destroyed it." *Wheatley v. Marietta Coll.*, 48 N.E.3d 587, 620 (Ohio Ct. App. 2016) (citing *Keen v. Hardin Mem. Hosp.*, Case No. 6–03–08, 2003 WL 22939453, at *4 (Dec. 15, 2003)). But Plaintiff relies on concrete evidence, rather than conjecture, to support his claim. As discussed above, he has presented evidence that Defendants destroyed video footage of him during the time period after Defendant Simons noticed him with DVDs in his shopping cart and before

Defendant Simons located him on the cameras in the video surveillance room. That is, in the Court's view, perhaps the most relevant evidence that could have been presented in this case.

### 4.    *Actual Disruption of Litigation and Damages*

Finally, Plaintiff has presented evidence showing that Defendants' alleged spoliation actually disrupted his criminal case and this case resulting in damages.

This Court's decision in *Stillwagon* is instructive. There, the plaintiff engaged in a heated confrontation with a fellow motorist, which led to his arrest for felonious assault. *Stillwagon v. City of Delaware*, 175 F. Supp. 3d 874, 882–87 (S.D. Ohio 2016) After the state trial court dismissed the charges against the plaintiff, the plaintiff filed a civil action bringing claims against the City of Delaware and various law enforcement officers for, among other things, false arrest, malicious prosecution, and spoliation of evidence. *Id.* at 887–89. Specifically, Plaintiff alleged that law enforcement officers had destroyed DNA evidence from the firearm he used in the alleged assault and a series of drawings and diagrams that the alleged victim made. *Id.* at 913. Based on these allegations, the Court found that the plaintiff had sufficiently stated a spoliation claim. *See id.* at 913–14 (concluding that "the destruction of that evidence disrupted Stillwagon's criminal defense; and … Stillwagon suffered damages that were proximately caused by the destruction of that evidence" where defendants destroyed "valuable exculpatory and impeachment evidence").

At summary judgment, the plaintiff presented evidence corroborating these allegations. *Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 779–81 (S.D. Ohio 2017). As the Court explained:

> Stillwagon avers that the destruction of the drawings disrupted his criminal case because the lost information would have helped to prove his innocence. And, according to Stillwagon, the destruction has also disrupted this case because the same lost information would have further demonstrated that no probable cause existed to prosecute him. The drawings illustrated statements about the incident made by Stillwagon, Mattingly, and Linkous. Stillwagon's drawings could have

33

bolstered his assertion that he acted in self-defense and was not attempting to shoot Mattingly. And the drawings from the interviews with Mattingly and Linkous could have highlighted the inaccuracies in the statements made by those two individuals. Consequently, a genuine issue of material fact exists on whether the destruction of the drawings disrupted Stillwagon's criminal case, civil case, or both.

*Id.* at 781 (internal citations omitted).

So too here. In Plaintiff's version of events, the destruction of the video evidence in question "disrupted his criminal case because the lost information would have helped to prove his innocence," *id.* And "the destruction has also disrupted this case because the same lost information would have further demonstrated that no probable cause existed to" initiate criminal proceedings against him, *id.*, further supporting his theory that Defendant Simons' actions were motivated by racial animus, rather than a legitimate nondiscriminatory reason. The deleted video evidence "could have bolstered [Plaintiff's] assertion," *id.*, that he did not steal the DVDs and "could have highlighted the inaccuracies in the statements made by" Defendant Simons, *id.*. For the same reason as in *Stillwagon*, there is a genuine issue of material fact as to whether the alleged destruction of the video evidence disrupted Plaintiff's criminal case or civil case.

\*     \*     \*     \*     \*

In sum, the parties have presented conflicting evidence concerning most, if not all, of the elements discussed above. A jury, not the Court, must resolve these factual disputes, and neither party is entitled to summary judgment as a result.

## F. Respondeat Superior

Plaintiff alleges that Defendant Kroger is liable for Defendant Simons' conduct under the doctrine of *respondeat superior*. (Doc. 54, ¶ 56). Defendants offer a number of arguments in response: (1) Defendant Simons is entitled to summary judgment on all of Plaintiff's claims, and, therefore, Defendant Kroger is as well; (2) *respondeat superior* does not apply under § 1981; and (3) Defendant Kroger is not liable for Plaintiff's malicious prosecution and spoliation of evidence

claims because Plaintiff cannot show that Defendant Simons' actions facilitated or promoted its business. (Doc. 72 at 32–33).

### 1. § 1981 Claim

Plaintiff may proceed with his § 1981 claim against Defendant Kroger based on *respondeat superior*. "[I]n suits against municipalities, § 1981 liability must be based on official municipal policy or custom, and not the doctrine of *respondeat superior*." *Highfill v. City of Memphis*, No. 2:07-CV-2510, 2010 WL 11493077, at *3 (W.D. Tenn. Jan. 21, 2010), *aff'd*, 425 F. App'x 470 (6th Cir. 2011) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 712, 733–35 (1989)). But "courts have widely acknowledged that *respondeat superior* liability is available in actions against private employers pursuant to § 1981." *Goodwin v. Fast Food Enters. No. 3, LLP*, No. CA 10-23, 2012 WL 1739830, at *3 (W.D. Pa. May 16, 2012) (collecting cases); *see also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 404 (1982) (O'Connor, J., concurring) ("[N]othing in the Court's opinion prevents the respondents from litigating the question of the employers' liability under § 1981 by attempting to prove the traditional elements of *respondeat superior*."); *Shebley v. United Cont'l Holdings, Inc.*, No. 17-CV-01906, 2020 WL 2836796, at *3 (N.D. Ill. May 31, 2020) (citations omitted) ("When a plaintiff sues a private entity under § 1981, that entity may be liable under a theory of *respondeat superior* or agency, subject to some limitations."). Because Defendant Kroger is a private entity, rather than a municipality, Plaintiff faces no impediment here to proceeding against Defendant Kroger on its *respondeat superior* theory under § 1981.

### 2. Malicious Prosecution and Spoliation Claims

Defendants next argue that Defendant Kroger cannot be liable for Defendant Simons' alleged state law intentional torts. (Doc. 72 at 33; Doc. 81 at 40). According to them, Plaintiff cannot show that Defendant Simons' actions were calculated to promote or facilitate Defendant Kroger's business as required by Ohio law. (Doc. 72 at 33).

In Ohio, "[t]he respondeat superior doctrine makes an employer or principal vicariously

liable for the torts of its employees or agents." *Auer v. Paliath*, 17 N.E.3d 561, 564 (Ohio 2014) (citing *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438, 628 N.E.2d 46 (Ohio 1994)). But the doctrine is triggered only if the employee's tort was "'committed within the scope of employment.'" *Auer*, 17 N.E.3d at 564 (quoting *Byrd v. Faber*, 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (Ohio 1991)).

"Whether an employee is acting within the scope of his employment is a question of fact to be decided by the jury" based "upon a multitude of considerations and fact-specific inquiries." *Auer*, 17 N.E.3d at 565–66 (citation, quotations, and alteration omitted). "First, the agent's tortious acts must have been 'an ordinary and natural incident or attribute of the service to be rendered, or a natural, direct, and logical result of it.'" *Id.* at 566 (quoting *Posin v. A.B.C. Motor Court Hotel, Inc.*, 344 N.E.2d 334, 339 (Ohio 1976)). Second, and "[m]ost importantly, in cases 'where the tort is intentional, the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed.'" *Auer*, 17 N.E.3d at 566 (quoting *Byrd*, 565 N.E.2d at 587). "Therefore, 'the determination of whether conduct is within the scope of employment or outside the scope of employment necessarily turns on the fact-finder's perception of whether the [employee] acted, or believed himself to have acted, at least in part, in his employer's interests.'" *Auer*, 17 N.E.3d at 566 (quoting *Ohio Govt. Risk Mgt. Plan v. Harrison*, 874 N.E.2d 1155, 1159 (2007 Ohio)). "The agent's motivations and the self-interested nature of her actions are therefore necessary considerations in a scope-of-agency inquiry." *Auer*, 17 N.E.3d at 566 (citations omitted).

*Tucker v. Kroger Company* offers some guidance here. 726 N.E.2d 1111 (Ohio Ct. App. 1999). While shopping at Kroger, the plaintiff in that case was confronted by a private security guard and a Kroger loss prevention specialist and accused of shoplifting Advil. *Id.* at 1112–13. After a series of physical altercations, the defendants subdued the plaintiff and called the police. *Id.* at 1113. The police arrived and found that the plaintiff did not have any Advil on his person. *Id.* The plaintiff subsequently filed a complaint bringing claims for assault and battery, false arrest,

36

false imprisonment, negligent and intentional infliction of severe emotional injury against, among others, Kroger. *Id.* at 1113–14.

On appeal, the plaintiff argued that the trial court erred in granting a directed verdict in favor of Kroger. The Tenth District reviewed the standard for applying *respondeat superior* and reversed. *Id.* at 1116. It found that "[p]reventing losses through shoplifting is clearly designed to facilitate or promote Kroger's business" and that a jury could have found Kroger liable for the acts of its loss prevention specialist and private security guard as a result. *Id.*

Here, Defendant Simons' responsibilities included, among others, detecting and apprehending shoplifters and archiving video for law enforcement requests. (Doc. 59-2 at 6–7). Plaintiff's malicious prosecution and spoliation claim implicate Defendant Simons' performance of those duties. And there is no question that the purpose of Defendant Simons performing those duties was to prevent shoplifting.

The dispositive question then "'turns on the fact-finder's perception of whether [Defendant Simons] acted, or believed himself to have acted, at least in part, in his employer's interests,'" *Auer*, 17 N.E.3d at 566 (quoting *Harrison*, 874 N.E.2d at 1159). That necessarily requires consideration of Defendant Simons' "motivations," *Auer*, 17 N.E.3d at 566 (citations omitted), a factual issue that is central to this case and hotly contested. On the one hand, a jury could find that Defendant Simons committed "an intentional and wil[l]ful attack … to vent his own spleen or malevolence against" Plaintiff, *Groob v. KeyBank*, 843 N.E.2d 1170, 1178 (Ohio 2006) (citation and internal quotations omitted). In that case, Defendant Kroger would not be liable for Defendant Simons' actions. On the other hand, a jury could find that Defendant Kroger is liable for Defendant Simons' actions because he "acted, or believed himself to have acted, at least in part," in Defendant Kroger's interest, *Auer*, 17 N.E.3d at 566 (citation and quotations omitted). A jury must resolve these competing accounts.

Defendants suggest that a finding that Defendant Simons was liable for malicious prosecution and spoliation necessarily precludes a finding that he was acting to promote or

37

facilitate Defendant Kroger's business. (*See* Doc. 72 at 33 ("To prove his intentional tort claims, Johnson must show that Simons maliciously and knowingly lied to the police in order to get an innocent man he had never met before arrested and prosecuted for a crime Simons knew he did not commit. Further, Johnson will also need to establish that Simons then intentionally destroyed video proving Johnson's innocence so that Simons could disrupt Johnson's criminal defense. If any of this was true, and it most certainly is not, Kroger could not be responsible for such malevolence. None of this conduct would 'facilitate or promote' Kroger's business.")).

But, in the Court's view, that conclusion is premised on an overly narrow reading of the law of *respondeat superior*. Defendants propose a categorical approach to the doctrine of *respondeat superior*: An employee's actions are either in an employer's interest or they are not. That dichotomous approach ignores that Ohio law recognizes an employee's motivations may fall somewhere in between. An employee like Defendant Simons could act for self-interested reasons, but also "believe[] himself to have acted, at least in part," in his employer's interest. *Auer*, 17 N.E.3d at 566 (citation and quotations omitted). If his motives were mixed, Kroger would be liable as a result. *See id.*

Defendants also attempt to distinguish this case from *Tucker*, emphasizing the differences between the underlying intentional tort claims involved. (Doc. 81 at 40 (internal citation omitted) ("Tucker does not involve the intentional torts of either malicious prosecution or spoliation of evidence. Tucker, instead, involved claims of false arrest, false imprisonment, and assault and battery. While 'preventing losses through shoplifting is clearly designed to facilitate or promote Kroger's business,' Johnson's allegation of malicious prosecution and willful spoliation of evidence by Simons is not. None of Simons' conduct, as alleged by Johnson in connection with his intentional tort claims would 'facilitate or promote' Kroger's business."). But, as the discussion above illustrates, the question of whether Defendant Simons' actions were intended to facilitate or promote Defendant Kroger's business is a disputed factual question that a jury must resolve.

## IV.    MOTION TO SEAL

Defendants have moved to permanently seal several exhibits used by Plaintiff at deposition. (*See generally* Doc. 63).  These documents are internal manuals and procedures regarding Defendant Kroger's loss prevention policies.  (*Id.* at 2).  According to Defendants, these documents could be used by potential shoplifters to avoid detection.  (*Id.* at 2–3).

Courts distinguish between limiting public disclosure of information during discovery versus the adjudicative stage of a case.  *See Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016).  "The line between these two stages, discovery and adjudicative, is crossed when the parties place material in the court record."  *Id.* (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002)).  "Unlike information merely exchanged between the parties, '[t]he public has a strong interest in obtaining the information contained in the court record.'"  *Shane Grp.*, 825 F.3d at 305 (quoting *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir. 1983)).  For this reason, the moving party has a "heavy" burden of overcoming a "'strong presumption in favor of openness' as to court records."  *Shane Grp.*, 825 F.3d 305 (quoting *Brown & Williamson*, 710 F.2d at 1179); *see also Shane Grp.*, 825 F.3d at 305 ("Only the most compelling reasons can justify non-disclosure of judicial records." (quotation omitted)).

"[I]n civil litigation, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is typically enough to overcome the presumption of access."  *Shane Grp.*, 825 F.3d at 308 (citation and quotations omitted).  "[T]he seal itself must be narrowly tailored to serve" the reason for sealing, which requires the moving party to "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations."  *Id.* at 305–06 (quotation omitted).  Ultimately, the movant must show that "disclosure will work a clearly defined and serious injury … And in delineating

the injury to be prevented, specificity is essential." *Id.* at 307–08 (internal citations and quotations omitted). Similarly, the court "that chooses to seal court records must set forth specific findings and conclusions which justify nondisclosure." *Id.* at 306 (quotation omitted).

Given the limited scope of Defendants' request and the continued public availability of the relevant deposition transcripts and briefing, the Court finds that sealing portions of Docs. 59-2 and 59-3 is appropriate here. This Court has permitted similar documents to be filed under seal before. *See Ross, et al. v. Home Depot USA Inc, et al.*, Case No. 2:12-cv-00743-TPK, Doc. 40 (S.D. Ohio September 18, 2013) (sealing defendant Home Depot's Asset Protection Guide); *see also Trevino v. Golden State FC LLC*, No. 117CV01300DADBAM, 2020 WL 550702, at *2 (E.D. Cal. Feb. 4, 2020) (collecting cases) (granting motion to seal internal human resources policies and procedures). And, on their face, these documents are proprietary in nature, detailing Defendant Kroger's internal policies and procedures regarding loss protection. Defendants' concerns about potential shoplifters using these materials to avoid detection is justified. Further, Defendants are not seeking to redact or seal all references or discussions of these documents, only the documents themselves. The relevant information will still be available to the public in the deposition transcripts, the parties' briefs, and the Court's decision, allowing any member of the public to understand the Court's decision-making process. The Court will, therefore, grant Defendants' Motion to Seal consistent with the instructions below.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 72) is **GRANTED in part and DENIED in part**; Plaintiff's Motions for Partial Summary Judgment (Docs. 73–75) are **DENIED**; and Defendant's Motion to Seal (Doc. 63) is **GRANTED**. Docs. 59-2 and 59-3 shall remain under seal. Within 14 days of this Opinion and Order being issued, Defendants shall file redacted version of those documents for the public docket. Defendants are

authorized to redact Exhibits 10, 13, 14, and 19 in their entirety.  All other exhibits in Docs. 59-2 and 59-3 shall be unredacted.

      IT IS SO ORDERED.


Date:  July 17, 2020                          /s/ Kimberly A. Jolson             
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE